**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A CRIMINAL COMPLAINT**

I, John Ypsilantis, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this Affidavit in support of an application for a criminal complaint charging Shihab Ahmed Shihab SHIHAB (SHIHAB) a/k/a Shihab Ahmed Shihab, Shihab Ahmed and Abu Ahmed, with, knowing that a person is an alien, attempting to bring to the United States in any manner whatsoever such person at a place other than a designated port of entry for the purpose of private financial gain, in violation of 8 U.S.C. § 1324(a)(1)(A)(i) and aiding and abetting the attempted murder of a person who formerly served as a United States Official, that is, a former President of the United States, with the intent to retaliate against such person on account of the performance of official duties during the term of service of such person, in violation of 18 U.S.C. §§ 115(a)(2) & 2.

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been since May 14, 2017.  I am currently assigned to the FBI Cincinnati Division (Columbus Resident Agency) Joint Terrorism Task Force (the "JTTF").  I have been assigned to this squad since January 2021.  From October of 2017 until January 2021, I was assigned to the FBI Pittsburgh Division Greater Pittsburgh Safe Streets Task Force.  I was employed as a U.S. Border Patrol Agent with the Department of Homeland Security (DHS) Customs and Border Protection (CBP) from July 23, 2009, to May 13, 2017.  From January 2012 until May 2017, I was assigned as a Task Force Officer (TFO) to the FBI Cleveland Division Organized Crime Task Force.

3.      During the course of my employment as an FBI Special Agent, FBI TFO, and U.S. Border Patrol Agent, I have participated in numerous complex criminal, national security, alien smuggling, United States (U.S.) immigration fraud, international and domestic terrorism, and drug trafficking investigations.  To successfully conduct these investigations, I have utilized a variety of

investigative techniques and resources including physical and electronic surveillance, various types of infiltration (including undercover agents, informants, and cooperating sources), pen register and trap and trace devices, GPS and telephone tracking devices, trash covers, mail covers, pole cameras, stationary video recordings, and audio and audio/video recording devices.

4.      In addition to the training I received at the FBI Academy and the U.S. Border Patrol Academy, I have received specialized training from the FBI and DHS/CBP focused on topics such as alien smuggling, drug detection, money-laundering techniques and schemes, drug identification, fraudulent immigration document identification and detection, asset identification and removal, and methods utilized by organized criminal enterprises, alien smuggling organizations, international and domestic terrorists, and drug trafficking organizations to carry out the aforementioned criminal conduct.

5.      Through the investigations that I have participated in, my training and experience, and conversations with other agents and law enforcement personnel, I have become familiar with the methods used by organized criminal enterprises, drug trafficking organizations, outlaw motorcycle gangs, street gangs, prison gangs, alien smugglers, alien smuggling organizations to safeguard controlled substances and firearms, to distribute, manufacture, and transport controlled substances and/or firearms, smuggle individuals into and throughout the U.S., facilitate immigration fraud schemes against the U.S. government, and to collect and launder related proceeds.

6.      The facts in this affidavit come from my personal observations, my training and experience, information obtained from other agents and witnesses, recorded conversations, review of records received from third parties, and information received from confidential sources.  This affidavit is intended to show merely that there is sufficient probable cause for the requested criminal complaint and does not set forth all of my knowledge about this matter.

2

## **PROBABLE CAUSE**

7.      SHIHAB is a citizen and national of Iraq and entered the United States in or around September 2020 as a B1/B2 Non-Immigrant Visa (NIV) holder (Visitor for Business or Pleasure). In or around March 2021, SHIHAB filed a claim for asylum with United States Citizenship and Immigration Services (USCIS) prior to the expiration date of his B1/B2 NIV status.  SHIHAB is currently present in the United States pending review and adjudication of his asylum claim.

8.      This investigation involves information received from two separate confidential sources, hereinafter CS1[1] and CS2[2].  CS1 is not known to CS2, and vice versa.  Under the direction of law enforcement, CS1 has represented him/herself to SHIHAB as someone who can assist with obtaining false immigration and identification documents, and who has connections with alien smuggling organizations that bring illegal aliens into the United States in exchange for money.

_____

[1] CS1 has been cooperating with law enforcement for over ten years and has received monetary gain in return for his/her services from the FBI. CS1 is currently motivated by the potential for monetary gain and/or other U.S. immigration benefits.  CS1 has provided reliable information in the past.  This past information has been corroborated by independent investigations and other techniques.  I believe that CS1 has provided reliable information relative to the instant investigation as the information provided by CS1 has been corroborated by independent investigations conducted by USCIS and U.S. Customs and Border Patrol (CBP).  Additionally, some of the information provided by CS1 has been corroborated independently by law enforcement means to include telephone subscriber information, toll records, pen register trap and trace analysis, other confidential source reporting, and physical surveillance.  Between April 2021 and the present, CS1 was debriefed on numerous occasions.  CS1 communicates with SHIHAB via cell phone and other online communication platforms.  Additionally, CS1 and SHIHAB meet in person.  CS1 has provided both historical and current information on SHIHAB and his associates.

[2] CS2 has been cooperating with law enforcement for over one year and has received monetary gain in return for his/her services from the FBI. CS2 is currently motivated by the potential for monetary gain and/or a sense of civic duty.  CS2 has provided reliable information in the past.  This past information has been corroborated by independent investigations and other techniques.  I believe that CS2 has provided reliable information relative to the instant investigation as the information provided by CS2 has been corroborated by independent investigations conducted by USCIS and U.S. Customs and Border Protection (CBP).  Additionally, some of the information provided by CS2 has been corroborated independently by law enforcement means to include telephone subscriber information, toll records, pen register trap and trace analysis, physical surveillance, as well as other confidential source reporting. Between July 2021 and the present, CS2 was debriefed on numerous occasions.  CS2 communicates with SHIHAB via cell phone and other online communication platforms.  Additionally, CS2 and SHIHAB meet in person.  CS2 has provided both historical and current information on SHIHAB and his co-conspirators.

Under the direction of law enforcement, CS2 has expressed interest in bringing over illegal aliens to the United States by utilizing services provided by SHIHAB; SHIHAB, in turn, attempted to utilize CS1 to do so and charged CS2 a fee for CS1's and SHIHAB's assistance.  While making these arrangements, SHIHAB admitted to CS1 that he wants to utilize CS1's services to illegally bring to the United States individuals associated with the Islamic State of Iraq and Syria (ISIS) and a group identified by SHIHAB as "Al Raed."  SHIHAB told CS1 that, once here, these individuals intend to murder former President George W. Bush.

9.       During debriefings with the FBI that occurred between April 2021 and May 2022, CS1 identified SHIHAB as being a citizen and national of Iraq who came to the U.S. through a U.S. Visitor Visa, which SHIHAB indicated he obtained through the assistance of a corrupt Iraqi American contractor at the U.S. Embassy.  CS1 stated that SHIHAB had told CS1 that SHIHAB had filed a claim for asylum with United States Citizenship and Immigration Services (USCIS) prior to the expiration date of his U.S. Visitor Visa and intends to bring his family in Iraq to the U.S. as beneficiaries through his asylum claim.  More recently, SHIHAB advised CS1 that he was concerned regarding his (SHIHAB's) pending immigration asylum application and may get married to a woman who is a United States citizen to obtain immigration status. SHIHAB stated that he paid for fraudulent divorce papers in Iraq, which showed that he was divorced from his current wife in Iraq.  CS1 informed law enforcement that SHIHAB is known by the alias "ABU AHMED" (phonetic).  Additionally, CS1 informed law enforcement that SHIHAB previously routinely traveled between the Indianapolis, Indiana metropolitan area and the Columbus, Ohio metropolitan area, and that SHIHAB had worked at a Halal Market in the Indianapolis, Indiana area and had an apartment near his place of employment.   Further, SHIHAB has held various jobs primarily in restaurants and/or markets throughout the Columbus, Ohio metropolitan area.

**Attempting to Bring in an Alien for Private Financial Gain**

*Shihab Meets CS2*

10.     On or about August 10, 2021, during an in-person meeting that was recorded by CS2, CS2 met with SHIHAB, introduced as "ABU AHMED," by their mutual friend.    At this same meeting, the mutual friend advised CS2 that SHIHAB was an individual who could aid CS2 in bringing over CS2's family and/or associates from Iraq.

11.     On or about August 10, 2021, SHIHAB asked CS2[3] about his/her brother who was interested in coming to the United States from Iraq. SHIHAB explained the process to CS2 with the following details. The cost to bring the brother to the United States would be $40,000 with $10,000 due up front paid to SHIHAB and the other $30,000 to be paid after crossing the United States border. A valid current passport, to include photo, would have to be provided to SHIHAB. The passport would be used by SHIHAB to illegally obtain a visa from the Mexican Embassy in either Egypt or Turkey. The whole process would take 30 days and CS2's brother would be in Mexico for approximately two weeks. Once the brother arrived in the United States, SHIHAB would help him get a job. CS2 disclosed to SHIHAB that the purported brother had been denied a visa to Europe in the past and that the brother may have ties to an "organization". SHIHAB told the CS2 that nobody cares, and it would be fine.[4]

---

[3] All the conversations between SHIHAB and CS2 were in Arabic.  The conversations between SHIHAB and CS2 set forth in this affidavit are in substance translations based upon summaries provided by translators and the debriefing of CS2 by law enforcement.  These summary translations are draft translations and not final transcripts.

[4] The Iraqi foreign national, mentioned above and throughout this affidavit, that SHIHAB arranged for and believes to have been smuggled into the United States is a fictitious individual. No actual persons were brought into the United States.  Additionally, all the actions taken by CS2 in regard to the facilitation of smuggling this fictitious Iraqi foreign national into the United States were done under the direction of the FBI.

12.     On or about August 17, 2021, during an in-person meeting that was recorded by CS2, SHIHAB advised CS2 that he (SHIHAB) trusted the individuals he worked with regarding smuggling and further advised that "they" just brought three people to the United States using this same route from Iraq and it went fine. SHIHAB said that September or October would be the best time to come.  SHIHAB advised CS2 that when ready to move forward he/she should send a picture of the passport to SHIHAB and provide the $10,000 to SHIHAB. SHIHAB told CS2 that this would get the process started and it would take approximately 60 days for the person to be smuggled into the United States.

13.     On or about October 5, 2021, CS2 exchanged several calls and text messages with SHIHAB.  During these communications, SHIHAB advised CS2 to text the image of the Iraqi Passport of the individual to be smuggled into the United States to SHIHAB.  SHIHAB then advised CS2 to call SHIHAB after the image was sent.  CS2 subsequently texted an image of the Iraqi Passport to SHIHAB. CS2 and SHIHAB then arranged for how and when CS2 was to pay for SHIHAB's services.

*SHIHAB involves CS1 in the Alien Smuggling*

14.     On or about October 3, 2021, SHIHAB contacted CS1[5] regarding arranging the smuggling of Iraqi nationals into the United States via the United States/Mexico international border.[6] Further, SHIHAB stated that he would primarily communicate with CS1 through an encrypted messaging application for security reasons.

_____

[5] Like SHIHAB's conversations with CS2, all the conversations between SHIHAB and CS1 were in Arabic.  The conversations between SHIHAB and CS1 set forth in this affidavit are in substance translations based upon summaries provided by translators and the debriefing of CS1 by law enforcement.  These summary translations are draft translations and not final transcripts.

[6] Throughout this investigation, at the direction of the FBI, CS1 and SHIHAB agreed that CS1's organization would utilize a smuggling route that traversed between the designated ports of entry on the United States / Mexico

15.     On or about October 5, 2021, CS1 received a text message from SHIHAB that contained a screenshot of an Iraqi passport (photo page) of an Iraqi national male whom SHIHAB was facilitating to be smuggled into the United States.[7]  SHIHAB subsequently called CS1 and discussed the details of the smuggling, to include payments to CS1.

16.      On or about October 6, 2021, CS2 met with SHIHAB to pay SHIHAB a down payment of $10,000 to begin the process to facilitate the smuggling of CS2's purported brother into the United States.  SHIHAB traveled to the Columbus, Ohio metropolitan area from Indiana to physically meet with CS2 to facilitate alien smuggling activities to include providing the above-mentioned $10,000 payment.

17.     On or about October 12, 2021, during an in-person meeting that was recorded by CS1, CS1 received a payment from SHIHAB in the amount of $5,000.  The $5,000 was given to CS1 by SHIHAB as a down payment to begin the process to facilitate the smuggling of CS2's purported brother into the United States.

18.     On or about October 12, 2021, during an in-person meeting that was recorded by CS1, SHIHAB told CS1 that he had been in recent communication with his (SHIHAB's) associates overseas. SHIHAB further advised CS1 that as soon as they can show success with smuggling an Iraqi foreign national into the United States SHIHAB's overseas associates will provide SHIHAB with the identities of more Iraqi foreign nationals ready to make down payments and begin the process of being smuggled into the United States. SHIHAB told CS1 that SHIHAB and his

---

international boundary to facilitate illegally smuggling foreign nationals into the United States, to include CS2's brother.  In other words, any person smuggled in would not pass through a designated port of entry.

[7] The Iraqi national male referenced above is the same individual that CS2 asked SHIHAB to have smuggled into the United States.

associates considered the first Iraqi foreign national being smuggled into the United States a "test run".

19.     On or about October 26, 2021, during an in-person meeting that was recorded by CS2, CS2, as directed by the FBI, told SHIHAB that he/she would be completely honest with SHIHAB and advised SHIHAB in approximately 2014 CS2's purported brother joined ISIS and that while with ISIS, CS2's brother fought in many battles. CS2 advised SHIHAB that when ISIS began losing control of territories CS2's brother escaped to Kirkuk, Iraq. While in Kirkuk, there was a search for individuals who fought with ISIS and CS2's brother then fled and escaped to Erbil, Iraq. CS2 told SHIHAB that while CS2's brother was in Erbil he was caught by the "Asayish"[8] and detained for a short period of time. CS2 advised SHIHAB that CS2's "brother"[9] was able to bribe members of the "Asayish" prior to the brother's court date and the brother was released. CS2 told SHIHAB that CS2's brother could no longer stay in Iraq after the brother was detained because the brother's name would be on a wanted list, so the brother fled Iraq and escaped to Gaziantep, Turkey.

20.     During the same meeting discussed above, CS2 advised SHIHAB that CS2's brother was living in Turkey and was able to renew his passport in Iraq by bribing individuals in Iraq. CS2 inquired whether this would cause any issues.  SHIHAB advised CS2 not to worry and told CS2 that SHIHAB's cousin was the former ISIS leader, Al-Baghdadi, and they were from the same tribe in Iraq. SHIHAB further advised CS2 that these types of situations are very common and SHIHAB

---

[8] Asayish is the Kurdish security organization and the primary intelligence agency operating in the Kurdistan region of Iraq.

[9] Throughout this affidavit, CS2 references the fictitious individual that SHIHAB is facilitating to be smuggled into the United States as CS2's "brother".  It was explained to SHIHAB by CS2 that the individual referenced as CS2's brother was a close family friend of CS2's biological brother and CS2's family regarded this individual as a brother.

himself was imprisoned several times by the Americans, Iraqis, Syrians, Jordanians, and Turks. Additionally, SHIHAB advised CS2 that it is a common belief in Iraq that all terrorists are Sunnis and that Sunnis are all ISIS or Al-Qaeda. SHIHAB advised CS2 that this was an easy issue to fix and that it will be taken care of.

21.    On or about October 27, 2021, during an in-person meeting that was recorded by CS2, SHIHAB advised CS2 that SHIHAB's associates said there was a security issue with the brother CS2 wanted SHIHAB to smuggle into the United States. Therefore, CS2's brother would now have to travel to Brazil first and then come up through Mexico and then into the United States. SHIHAB explained that the reason for this was that the United States, Canada, and Mexico all shared immigration information.  SHIHAB advised CS2 that CS2's brother would now obtain a Brazilian Visa through SHIHAB and his associates and travel from Brazil through Mexico and then be smuggled into the United States.

22.    On or about November 15, 2021, and November 26, 2021, during in-person meetings that were recorded by CS2, CS2 met with SHIHAB and paid SHIHAB $5,000 at each meeting to continue the process to facilitate the smuggling of CS2's purported brother into the United States.

23.    On or about November 30, 2021, CS1 met with SHIHAB at his apartment complex and received $6,000 in cash from SHIHAB as a final payment for facilitating the smuggling of CS2's purported brother into the United States.    CS1 advised the FBI that SHIHAB gave CS1 an additional $1,000 cash (in addition to the outstanding $5,000.00 owed by SHIHAB to CS1) because CS1 had uncovered that SHIHAB had received additional money from the Iraqi foreign national that SHIHAB had arranged to be smuggled into the United States.[10]

---

[10]   FBI directed CS1 to advise SHIHAB that CS1's organization knew that SHIHAB had received additional money from CS2.

24.     On or about December 21, 2021, during a recorded in-person meeting at a Starbucks parking lot in the Southern District of Ohio, CS2 paid SHIHAB $20,000 in cash as a final payment for facilitating the smuggling of CS2's purported brother, an Iraqi foreign national, into the United States through the Mexico / United States border.  SHIHAB told CS2 to get rid of CS2's cell phone that was used to coordinate the smuggling of the Iraqi foreign national into the United States. SHIHAB also told CS2 that this was a trial run and now CS2 could use the smuggling success to advertise to more individuals overseas. Finally, SHIHAB advised CS2 that CS2 received a good deal as SHIHAB stated that he (SHIHAB) had just smuggled two individuals associated with Hezbollah[11] into the United States and charged them $50,000.00 each.

**Aiding and Abetting the Attempted Murder of a Former President of the United States**

*SHIHAB's Trip to Michigan and Claimed Connection to Terrorist Organizations*

25.     On or about November 30, 2021, during an in-person meeting that was recorded by CS1, CS1 and SHIHAB traveled together from Columbus, Ohio to the greater Detroit, Michigan metropolitan area and then returned to Columbus, Ohio. The purpose of the trip was for SHIHAB and CS1 to discuss smuggling additional Iraqi foreign nationals into the United States as well as to visit Middle Eastern bakeries and restaurants in the greater Detroit, Michigan metropolitan area. All of the below conversations occurred during this November 30, 2021 trip.

26.     In sum and substance, CS1 and SHIHAB discussed the next group of foreign nationals that they wanted to smuggle into the United States. CS1 asked SHIHAB if the foreign

---

[11] Hezbollah is a designated foreign terrorist organization. SHIHAB did not provide any additional information regarding the identities of those individuals SHIHAB had stated that he had smuggled into the United States.

nationals that SHIHAB had arranged to bring in were "clean" and would be able to initially travel to Mexico from overseas. [12]

27.    CS1 asked SHIHAB if the Iraqi foreign nationals that SHIHAB was arranging to be smuggled into the United States were "clean" or "dirty."  SHIHAB advised CS1 that they would have to bring SHIHAB's four Iraqi foreign nationals to Brazil initially. CS1 further advised SHIHAB that SHIHAB needed to be honest about these four Iraqi foreign nationals and that it did not matter about the Iraqi nationals' affiliations to any groups but CS1 and CS1's associates needed to know for them to make the proper arrangements to smuggle these individuals into the United States.  CS1 again asked SHIHAB if these four Iraqi foreign nationals were the same as the previous traveler (Iraqi foreign national) they had brought in, and are they DAESH (ISIS)? SHIHAB stated they (the four Iraqi foreign nationals) are with them (meaning members of ISIS) and need to come in initially through Brazil and they are not "clean".

28.    SHIHAB advised CS1 that SHIHAB had aided the resistance, with killing many Americans in Iraq between 2003 and 2006.  Based on my training and experience as well as my knowledge of this investigation, I believe that when SHIHAB referenced the "resistance," that he was referencing Al-Qaeda in Iraq ("AQI") or Daesh (ISIS), which emerged from AQI.  For example, SHIHAB advised CS1 that SHIHAB transported vehicles and weapons from Syria into Iraq and supplied them to the resistance. SHIHAB stated that these vehicles he transported were

---

[12] CS1 articulated to law enforcement that CS1 and SHIHAB used the term "clean" meaning the foreign nationals that were being smuggled into the United States did not have any connections to terrorist organizations and did not have criminal records. If the foreign nationals were clean, they could travel directly into Mexico first from overseas and then be smuggled into the United States. Further, when CS1 and SHIHAB used the term "dirty," that referred to foreign nationals that were being smuggled into the United States that had derogatory information or past connections to terrorist organizations or had criminal records. If the foreign nationals were "dirty", they had to first travel into Brazil from overseas and then be smuggled into the United States.

routinely packed with explosives and placed on both sides of various roads throughout Iraq. SHIHAB stated that when the Americans traveled these roads the vehicles and explosives in them would be detonated and kill the American soldiers.

29.      SHIHAB advised CS1 that he had the passport images of three of the four Iraqis that he wants to arrange to be smuggled into the United States. SHIHAB told CS1 that the fourth Iraqi national that he wanted to smuggle into the United States was the secretary of an ISIS financial minister and that he was still awaiting this passport information but expected to have it soon. SHIHAB advised that once this ISIS financial minister's secretary was in the United States, SHIHAB and his associates would have access to large amounts of money. SHIHAB told CS1 that he planned to utilize a car dealership in Columbus, Ohio to act as a hawala to funnel the money into the United States from the ISIS financial minister's secretary.

30.      SHIHAB told CS1 that the four Iraqi nationals SHIHAB wanted to smuggle into the United States are planning to kill former president George W. Bush. SHIHAB advised CS1 that former president Bush had a house and farm in Texas. SHIHAB twice inquired if CS1 knew what type and amount of security there was protecting former president Bush, as SHIHAB believed CS1 had connections in the Dallas area. SHIHAB asked if CS1 thought that four to six individuals were enough to kill former president Bush.  CS1 stated that he/she did not know but believed former president Bush would have security.

31.      SHIHAB asked if CS1 could obtain replica or fraudulent police and/or FBI identifications and badges for the plot. SHIHAB further asked if CS1 and his/her associates could arrange for these Iraqi nationals to be smuggled out of the United States via the United States/Mexico border the same way they would be smuggled in after they carried out the assassination.

12

32.     SHIHAB advised CS1 that they wished to kill former president Bush because they felt that he was responsible for killing many Iraqis and breaking apart the entire country of Iraq. Based on my training and experience as well as my knowledge of this investigation, it is my belief that SHIHAB is referring to "Operation Iraqi Freedom," which was the armed conflict that began in 2003, during George W. Bush's presidency.

33.     CS1 stated that SHIHAB showed CS1 a cell phone, which appeared to have many different group conversations using an encrypted messaging application. SHIHAB advised CS1 that these groups were Baath and ISIS chat groups. CS1 stated that SHIHAB showed CS1 one of these group conversations that displayed a document in Arabic. CS1 stated that the document was supposedly an image of a Syrian Intelligence document that showed former Iraqi president Al-Maliki had a contract with the Syrian government and worked with Syrian intelligence.

*January Meeting*

34.     On or about January 13, 2022, during an in-person meeting that was recorded by CS1, SHIHAB advised CS1 that SHIHAB belonged to a unit or group overseas that was known by the Arabic word "Al-Raed" (Phonetic) meaning "Thunder". SHIHAB further advised that the leader of SHIHAB's unit was a former Iraqi pilot for Saddam Hussein identified by SHIHAB as Arshad Yassim (Phonetic), hereinafter referred to as Yassim.[13] SHIHAB stated that Yassim, who supported the plot to assassinate former President Bush, had recently passed away in Qatar where Yassim had resided and operated from. SHIHAB advised CS1 that the "Al-Raed" unit or group was first established in Iraq after the Americans invaded in approximately 2003. SHIHAB stated that a new leader for the "Al-Raed" unit would be selected soon.

---

[13] Through open-source information, the FBI confirmed that Arshad Yassim was a former bodyguard and relative of Saddam Hussein and passed away on January 12, 2022 in Doha, Qatar.

13

35.     SHIHAB stated that once a new leader was selected for "Al-Raed" they would continue to plan for the "mission" to assassinate former president Bush.  SHIHAB further stated that "they" will send approximately six or seven people for this mission.  SHIHAB advised that part of his (SHIHAB's) role in the mission will be to locate and conduct surveillance on former president Bush's residences and/or offices and obtain firearms and vehicles to use in the assassination.  SHIHAB inquired with CS1 if it would be difficult to obtain firearms that would be able to penetrate a vehicle.  Further, SHIHAB stated that the best type of vehicle to obtain for use in the mission would be a large van with sliding doors.  CS1 and SHIHAB discussed that obtaining these items was possible if SHIHAB had access to the money that was needed to procure these things.

36.     SHIHAB stated that two of the individuals that will take part in the assassination of former president Bush are former Iraqi intelligence agents.  SHIHAB stated that these individuals do not care if they die during the mission or make it out of the U.S.  SHIHAB further stated that the other five individuals would be made up of members from Daesh (ISIS) and "Al-Raed".[14]  SHIHAB referenced all these individuals to be involved in the assassination of former president Bush as "soldiers."  SHIHAB referred to himself as a soldier waiting for directions from the leadership in Qatar.  Further, SHIHAB stated that he wanted to be involved in the actual attack and assassination of former president Bush and did not care if he died as he would be proud to have been involved in killing former president Bush.  SHIHAB stated that he was told by the leadership that his role was related to travel logistics, obtaining and providing vehicles and weapons, as well as to find the

---

[14]   On several occasions, SHIHAB told the CHS, in substance, that the "Al-Raed" group that was planning to assassinate former President Bush was unrelated to ISIS, but he was hoping that ISIS would approve and collaborate in the assassination.

locations of former president Bush's residences/offices and conduct surveillance in order to show the "others". SHIHAB stated that after this was accomplished SHIHAB was to leave the area and not be there when the assassination took place.

37.     SHIHAB advised CS1 that SHIHAB's group had asked SHIHAB how difficult it was to obtain firearms. SHIHAB advised CS1 that he (SHIHAB) told them firearms were easy to obtain through the "black-market" if they have money.

*February Meeting / Travel to Dallas Surveillance of Locations*
*Associated with Former President Bush*

38.     On or about February 7, 2022, during an in-person meeting that was recorded by CS1, CS1 picked up SHIHAB at Dallas/Fort Worth International Airport.[15]   CS1 and SHIHAB discussed the logistics and potential costs of the mission to assassinate former president Bush. SHIHAB advised CS1 that he (SHIHAB) wanted to take videos of former president Bush's office and residence. SHIHAB stated that he (SHIHAB) wanted to send these videos to the two former Iraqi intelligence officers that are part of the group of people that would be involved in the assassination of former president Bush. SHIHAB stated that the two former Iraqi intelligence officers were professionals and very experienced in attacks and assassinations.

39.     The next day, on February 8, 2022, during an in-person meeting that was recorded by CS1, CS1 met with SHIHAB at SHIHAB's hotel in Dallas, Texas. CS1 advised that upon picking up SHIHAB, SHIHAB instructed CS1 something to the effect of let's go to "our place". CS1

_____

[15] Prior to traveling to Dallas, Texas via commercial airline SHIHAB had initially planned to drive from Columbus, Ohio to Dallas, Texas. On or about January 31, 2022, SHIHAB advised CS1 that SHIHAB was having mechanical issues with his vehicle. SHIHAB requested that CS1 assist him (SHIHAB) purchasing commercial airfare to Dallas, Texas as well as reserve a hotel room in the Dallas, Texas area. SHIHAB advised CS1 that SHIHAB would pay CS1 back for the commercial airfare and hotel room. CS1 agreed to assist SHIHAB with purchasing the commercial airfare and hotel room at the direction of law enforcement.

advised that SHIHAB asked CS1 if CS1 was familiar with the area where former president Bush resided. CS1 advised SHIHAB that CS1 was not. CS1 and SHIHAB proceeded to travel to former president Bush's residence in Dallas, Texas using CS1's GPS. CS1 stated that SHIHAB was the front seat passenger in the vehicle and CS1 was the driver.

40.    CS1 stated that SHIHAB began to take video recordings using a cell phone when exiting the expressway leading to former president Bush's residence. CS1 stated that SHIHAB and CS1 took two passes by the front access gate leading into the neighborhood of former president Bush's residence. CS1 further stated that SHIHAB continued to record videos of the front access gate and surrounding area leading into the neighborhood of former president Bush's residence during each pass. CS1 and SHIHAB discussed that it would not be a good idea to send the videos to SHIHAB's associates overseas because the government could intercept them and identify SHIHAB and CS1. CS1 advised that CS1 did not want to get in trouble. SHIHAB agreed and advised CS1 that SHIHAB uses a setting or program on his cell phone called "sensors off". SHIHAB advised CS1 that he (SHIHAB) activates this setting/program each time he utilizes this cell phone to not allow any communications to be intercepted. SHIHAB showed CS1 how to activate the "sensors off" function.

41.    During the same February 8, 2022 meeting, SHIHAB further advised CS1 that the two former Iraqi intelligence officers that will be part of the group brought from overseas into the United States will take the lead to actually carry out the assassination of former president Bush. SHIHAB advised CS1 that these two individuals are professionals and will conduct several weeks of surveillance on former president Bush. SHIHAB stated that the two former Iraqi intelligence officers will determine the best way to conduct the attack and assassination once they are in the

United States. SHIHAB advised CS1 that SHIHAB does not know all the details and is only told what he (SHIHAB) needs to know.

42. During the same February 8, 2022 meeting, SHIHAB and CS1 parked in a lot in the vicinity of the GEORGE W. BUSH INSTITUTE, located in Dallas, Texas, exited the vehicle and began walking around the area on foot. CS1 reported to the FBI that SHIHAB began to take video recordings with his cell phone of the library and office area of the GEORGE W. BUSH INSTITUTE.

43. During the same February 8, 2022 meeting, SHIHAB and CS1 discussed looking at firearms to use in the assassination in the near future as SHIHAB had previously expressed interest to CS1 during previous meetings.

44. On or about February 9, 2022, during an in-person meeting that was recorded by CS1, CS1 met with SHIHAB at SHIHAB's hotel (the Westin) located in Dallas, Texas. SHIHAB advised CS1 that as soon as he received any word from Qatar SHIHAB will call or text CS1 and use coded language and say, "the invitation is ready". SHIHAB and CS1 also discussed meeting in Columbus, Ohio in approximately the end of February 2022. SHIHAB advised CS1 that if CS1 has firearms and police uniforms to show SHIHAB, CS1 should use the coded language and say the "samples" are ready. CS1 and SHIHAB discussed obtaining the sizes that would be needed for the uniforms for the "AL-RAED" and DAESH (ISIS) members who would be carrying out the assassination of former president Bush.

*March Meeting / Samples of Firearms and United States Border Patrol Uniform*

45. On or about March 2, 2022, during an in-person meeting that was recorded by CS1, CS1 and SHIHAB met at CS1's hotel room in Columbus, Ohio, to look at sample firearms and law enforcement uniforms.

17

46.     During this same meeting on or about March 2, 2022, CS1 presented SHIHAB with the samples of firearms to include one Colt M-16 rifle, one AK-47 rifle, one Sig Sauer P226 pistol, and one United States Border Patrol uniform with gun belt.[16]  CS1 stated that SHIHAB examined and handled the firearms and the uniform. CS1 stated that at one-point SHIHAB tried on the United States Border patrol hat. CS1 stated that SHIHAB took photographs of the firearms and uniform with his cellphone to send to his (SHIHAB's) associates.

47.     During this same meeting, CS1 stated that SHIHAB was most interested in obtaining Colt M-16s and the Sig Sauer P226 pistols for use in the operation to assassinate former president Bush.  SHIHAB asked if CS1 could obtain grenade launchers that can be attached to the barrel of the M-16s. CS1 advised that this should be possible. SHIHAB and CS1 discussed the uniforms and CS1 explained that these were official United States Border Patrol uniforms. SHIHAB advised CS1 that these would be perfect for crossing the border.

48.     SHIHAB also told CS1 that the group in Qatar, known to CS1 as "AL RAED", had selected a new leader.  SHIHAB further advised CS1 that SHIHAB did not like the new leader as the new leader was prone to stealing money. SHIHAB stated that the new leader told the "AL RAED" group that the mission to assassinate former president Bush will cost approximately three-million U.S. dollars. SHIHAB expressed to CS1 that he (SHIHAB) needed to obtain a U.S. green-card to travel to Qatar and meet with the leadership of "AL-RAED" face to face to go over the assassination plot. SHIHAB advised that the two former Iraqi intelligence officers that are members

---

[16] The firearms shown to SHIHAB included one Sig Sauer P226 pistol bearing serial number U592726 and one magazine, one Colt M-16 rifle bearing serial number 5131974 and one magazine, one AK-47 rifle bearing identification number WABR-10 and one magazine, and one rough duty United States Border Patrol uniform and gun belt with holster.  The firearms and law enforcement uniform were provided to CS1 by the FBI and CS1 presented the firearms and law uniform to SHIHAB under the direction of the FBI.  The firearms shown to SHIHAB as sample described above were inert.

of "AL-RAED" instructed SHIHAB that he (SHIHAB) needs to be very careful discussing anything over the phone which is why SHIHAB needed to conduct an in-person meeting.

**SHIHAB's Interview with the FBI in April 2022**

49.     On or around April 20, 2022, SHIHAB was interviewed in person by FBI personnel.[17]  In sum and substance, SHIHAB advised law enforcement that he) had met individuals associated with what SHIHAB described to be a large smuggling network which had the ability to smuggle individuals from overseas into the United States via the United States / Mexico border, to include CS1.[18]

50.     SHIHAB advised that in or around November 2021 he was contacted by a relative who drove for Uber that introduced him to an individual (referenced herein as "CS2").[19]  SHIHAB advised CS2 wished to smuggle a relative into the United States and was willing to pay a large sum of money.  SHIHAB advised law enforcement that SHIHAB eventually met CS2 in person as he (SHIHAB) thought that this was suspicious.  SHIHAB stated that CS2 eventually told SHIHAB that CS2's relative was a wanted man in Iraq and a member of ISIS.  SHIHAB advised CS2 that he

_____

[17] In or around the end of March 2022, United States immigration officials conducted an asylum interview with SHIHAB.  After the interview was conducted United States immigration officials advised the FBI that SHIHAB may have information regarding an ISIS member that was recently smuggled into the United States.  Law enforcement contacted SHIHAB at his residence in Columbus, Ohio. An FBI linguist was present and translated communications between law enforcement and SHIHAB.  Upon contacting SHIHAB, SHIHAB was advised of the identity of those present and that agents had received notification from United States immigration officials that SHIHAB may have information regarding an ISIS member that was recently smuggled into the United States.  SHIHAB invited FBI personnel into his residence and voluntarily agreed to speak with agents.  Further, SHIHAB was advised and consented to the interview being recorded.

[18] SHIHAB identified CS1 by a different name.  The name used by SHIHAB will not be included since doing so will likely reveal to the SHIHAB and others known and unknown the identity of CS1 and thus place CS1's safety in jeopardy.  SHIHAB was unaware that CS1 was an FBI confidential source.

[19] SHIHAB identified CS2 by a different name.  The name used by SHIHAB will not be included since doing so will likely reveal to the SHIHAB and others known and unknown the identity of CS2 and thus place CS2's safety in jeopardy.  SHIHAB was unaware that CS2 was an FBI confidential source.

(SHIHAB) knew of a smuggling network that he (SHIHAB) could contact on behalf of CS2. SHIHAB stated that he (SHIHAB) offered to do this as he (SHIHAB) was curious to see if the smuggling network would actually be able to accomplish the smuggling of CS2's relative.

51.     SHIHAB then advised law enforcement that he contacted another individual (referenced herein as "CS1") and advised CS1 that SHIHAB had met CS2 and that CS2 was looking to smuggle a relative into the United States.  SHIHAB stated that he further advised CS1 that CS2's relative was wanted in Iraq and was a member of ISIS.  SHIHAB stated that CS1 advised that this was not a problem and CS1 could still smuggle this individual into the United States. SHIHAB stated that CS1 advised him that it would cost $30,000 dollars U.S. currency to smuggle CS2's relative into the country and that $15,000 dollars U.S. currency would need to be paid to CS1 upfront.  Additionally, an image of CS2's relative's passport would have to be provided to CS1. SHIHAB advised that he relayed this information to CS2 and CS2 provided SHIHAB with an image of CS2's relative's passport as well as $15,000 dollars U.S. currency.  SHIHAB stated that he (SHIHAB) provided the $15,000 dollars U.S. currency as well as the image of the passport to CS1.

52.     SHIHAB stated that he contacted an associate in Iraq who was a policeman, hereinafter referred to as B.U.  SHIHAB then stated that he provided the image of CS2's relative's passport to B.U.  SHIHAB stated that after checking into CS2's relative's passport information, B.U. stated that CS2's relative was in fact wanted in Iraq and a member of ISIS.[20]

53.     SHIHAB stated that CS1's network was able to smuggle this individual into the United States.  SHIHAB provided his telephone number, as well as the telephone numbers of CS1

---

[20] As previously noted in this affidavit, the Iraqi foreign national, mentioned above and throughout this affidavit, that SHIHAB arranged for and believes to have been smuggled into the United States is a fictitious individual. No actual persons were brought into the United States

and CS2 to law enforcement. During the interview SHIHAB was not fully truthful as to his own role in the alien smuggling scheme. SHIHAB omitted the fact that he (SHIHAB) was paid $40,000 dollars U.S. currency byCS2 of which he kept $27,000 U.S. currency for his role in the alien smuggling scheme. Additionally, SHIHAB did not mention the plot to assassinate former President Bush despite being asked if he had any other information about possible terrorist acts or pending attacks. Further SHIHAB did not mention that he had physically looked at samples of firearms provided by CS1 to be used in the assassination plot of former President Bush.

## Conclusion

54. Your affiant respectfully submits that the forgoing establishes probable cause for a criminal complaint charging Shihab Ahmed Shihab SHIHAB (SHIHAB) with knowing that a person is an alien, attempting to bring to the United States in any manner whatsoever such person at a place other than a designated port of entry for the purpose of private financial gain, in violation of 8 U.S.C. § 1324(a)(1)(A)(i) and aiding and abetting the attempted murder of a person who formerly served as a United States Official, that is, a former President of the United States, with the intent to retaliate against such person on account of the performance of official duties during the term of service of such person, in violation of 18 U.S.C. §§ 115(a)(2) and 2.

Respectfully submitted,



_____
John Ypsilantis
Special Agent, Federal Bureau of Investigation

Subscribed and sworn to before me on_____May 23_____, 2022

Elizabeth A. Preston Deavers
United States Magistrate Judge